UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ABBRELLA F. CAPPS,<br><br>Plaintiff,<br><br>v.<br><br>YELEY Officer,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:19-cv-01248-JPH-MJD |

**Order Granting Defendant's Motion for Summary Judgment**

Plaintiff Abbrella Capps, at relevant times an inmate at Bartholomew County Jail ("BCJ"), brings this lawsuit alleging that jail officer Drew Yeley used excessive force on her by gripping her arm too tightly during an escort. For the following reasons, Officer Yeley's motion for summary judgment, dkt. [18], is **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a

movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

**II. Statement of Facts**

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered to be undisputed except to the extent that disputes are noted.

On December 11, 2018, Ms. Capps was arrested on warrants in two cases for which she was on probation and new charges of possession of marijuana and possession of a controlled substance. Dkt. 18-3 at 12–13. For the prior cases, she had been ordered to participate in a residential program through community corrections, but she absconded from the program and was "on the run" until her arrest on December 11. *Id*. at 13, 16–17. Upon her arrest, she was taken to the Bartholomew County Jail.

During the timeframe relevant to the Complaint, Ms. Capps was housed in J block, the female segregated block. Dkt. 18-1 at ¶ 3.[1] Cellblocks are monitored via video camera by officers stationed in a tower, and the tower officers can communicate with inmates through an intercom. *Id*. Inmates in J block are let out of their cells for one hour per day during which they have access to the dayroom area. *Id*. Communication between inmates in different cellblocks is prohibited. *Id*. Standing near the door of an adjacent cellblock and attempting to communicate with the inmates in the other block is known as "talking on the door" at the jail. If an inmate is told to "get off of the door" or to stop "talking on the door," she is being directed to move away from the door to an adjoining cellblock and not communicate with the inmates there. *Id*.

On February 2, 2019, Ms. Capps was involved in a verbal confrontation with Officer Yeley after Officer Yeley and Officer Megel had directed Ms. Capps over the intercom to "lockdown" or return to her cell for "talking on the door" *Id*. at ¶ 4. Because Ms. Capps refused to return to her

---

[1] Two paragraphs of Officer Yeley's declaration are enumerated as paragraph 3. Both paragraphs discuss communication in the J Block, so the Court refers to these paragraphs simply as "¶ 3."

cell, Officer Yeley went to J block to secure Ms. Capps in her cell. *Id*. A verbal confrontation ensued during which Ms. Capps called Officer Yeley a "bitch" and "fake ass cop." *Id*. Ms. Capps eventually complied with Officer Yeley's order to return to her cell, and no physical contact or force was used. *Id*.; dkt. 18-4 at 10, 15.[2]

Ms. Capps' claim in this case arises from a similar incident that occurred on March 20, 2019. Ms. Capps was serving a disciplinary lockdown sentence (known as a 30-day Jail Rule Violation or "JRV") for an unrelated incident. Dkt. 18-2 at ¶ 4. During Ms. Capps' hour out of her cell, tower officer Michael Forney instructed Ms. Capps to return to her cell after he saw her "talking on the door" twice. *Id*. at 6. The second time Officer Forney saw Ms. Capps "talking on the door," she appeared to be retrieving a note from the adjacent cellblock. *Id*. Because Ms. Capps refused multiple directives, Officer Yeley went to the cellblock to secure her in her cell. Dkt. 18-1 at ¶ 5. When she continued to refuse, Officer Yeley ordered her to turn around to be handcuffed. *Id*. at ¶ 6. Officer Yeley spoke with Ms. Capps for approximately five minutes on the upper tier of the cellblock before other officers arrived. V1[3] at 2:27:03 to 2:31:35. During this encounter, Ms. Capps again called Officer Yeley a "fake ass cop" or "mall cop." Dkt. 18-1 at ¶ 6. During this part of the encounter, Officer Yeley did not touch Ms. Capps. *Id*.

Backup officers were called because Ms. Capps continued to refuse to return to her cell. *Id*. Sgt. Zach Morey was the first officer to arrive, followed by Captain Tyler Stillabower and Lt. Kaleigh Morey. *Id*. at ¶ 7. Ms. Capps initially refused to be handcuffed, holding onto the railing to prevent the officers from handcuffing her. *Id*.; V1 at 2:32:34. After Sgt. Morey pulled out a can of pepper spray and threatened to use it, Ms. Capps allowed the officers to handcuff her. Dkt. 18-

[2] Officer Yeley included excerpts of Ms. Capps' deposition. The page numbers refer to the page number of the PDF document, not the page of the deposition.

[3] The Court has reviewed the videos of the incident. The Court refers to video discs 1, 2, and 3 as V1, V2, and V3, respectively.

4 at 22. Officer Yeley assisted with the handcuffing by holding Ms. Capps' right arm while Lt. Morey and Captain Stillabower handcuffed her left wrist. Dkt. 18-1 at ¶ 7. Captain Stilllabower used a second set of handcuffs to secure Ms. Capps' right wrist. *Id*.

The officers then escorted Ms. Capps from the second floor of the jail to a holding cell on the first floor. *Id*. at ¶¶ 8–10. While on the upper level walkway in J block, Captain Stillabower held onto Ms. Capps' left arm. *Id*. at ¶ 9. They proceeded single file with Ms. Capps in front down the stairs. V1 at 2:33:55. Officer Yeley was not touching Ms. Capps' arm at that point. *Id*. at 2:33:55 to 34:12.

As they walked in a corridor, Officer Yeley briefly held Ms. Capps' right arm while Captain Stillabower continued to hold her left arm. V1 at 2:34:18. Officer Yeley let go when they went through doorway 203 as Captain Stillabower continued to hold her left arm. *Id*. at 2:34:27.

A few seconds later, while the group was walking in corridor 202, Captain Stillabower released Ms. Capps' left arm, and Officer Yeley held her right arm for the remainder of the escort. Dkt. 18-1 at ¶¶ 9–11; V2 at 2:34:32 through V3.

The remaining part of the escort lasted approximately two minutes. *See* V2 and V3. During this time Officer Yeley was holding Ms. Capps' right arm. *Id*. The purpose of the escort hold was to communicate officer presence and deter any resistance. Dkt. 18-1 at ¶ 12. Officer Yeley stated that if Ms. Capps complained that Officer Yeley's grip was too tight, he would have loosened his grip or re-positioned his hand. Dkt. 18-1 at ¶ 11. He recalled that Ms. Capps was calm and did not appear to be in pain. *Id*. Ms. Capps disputes this, stating she complained to Officer Yeley that he was holding her arm too tightly and was hurting her. Dkt. 18-4 at 27–29. The video has no audio. During most of the video, Ms. Capps is not speaking, although she appears visibly upset. V2 at 2:34:32 through V3 at 2:36:58. There are a few moments where the video

only shows Ms. Capps from behind. At one point on the elevator, it is possible that Ms. Capps said something, *see* V2 at 2:25:30, but Officer Yeley and the other occupants of the elevator have no reaction to it.

When Ms. Capps and the officers arrived at the holding cell, Ms. Capps was facing the wall furthest from the door. V3 at 2:36:18. Officer Yeley held Ms. Capps' right arm as Sgt. Morey removed the cuff from her right wrist. V3 at 2:36:34. Officer Yeley held Ms. Capps' right arm against the wall while the left handcuff was being removed. *Id*. at 2:36:39. Ms. Capps was then instructed to keep both hands on the wall, and the officers left. Dkt. 18-1 at ¶ 10; V3 at 2:36:52.

Although Ms. Capps looks upset during the escort—her face is tear-stained and she sighs several times—she does not appear to be in physical pain at any point during the initial detainment or subsequent escort. V1 – V3.

Ms. Capps asked that photos be taken of her purported injuries on March 22, two days after the incident. Dkt. 18-5 at 1. The photos were taken that day. *Id*. The second photo shows a circular bruise on the inside of Ms. Capps' right arm a few inches above the elbow. Dkt. 18-2 at 13. The fourth and fifth photos show a faint bruise on the side of the right arm. *Id*. at 15–16. Officer Yeley cites evidence to show that the bruises are inconsistent with Officer Yeley's hand position during the escort. Dkt. 18-2 at ¶¶ 7–8. Ms. Capps disputes that Officer Yeley's hand position was inconsistent with the location of the bruises. Dkt. 25 at 5.

Before the March 20 incident, Ms. Capps had requested an appointment with the jail physician regarding her psychiatric medication. Dkt. 18-2 at 17. She saw Dr. Everson on March 22, *id*. at 18, two days after the incident. Though she contends she showed Dr. Everson the bruises, the medical progress note from the visit does not refer to the bruises or Ms. Capps' purported injury. *Id*. Ms. Capps does not remember what Dr. Everson said about the bruises. Dkt. 18-4 at

40. The bruises healed on their own and required no treatment. *Id*. at 39. However, Ms. Capps alleges that the force Officer Yeley used during the escort triggered her post-traumatic stress disorder due to prior violent and sexual assaults. *Id*. at 42.

Ms. Capps is no longer incarcerated at the Bartholomew County Jail. Dkt. 18-2 at ¶ 2. She was transported to the Indiana Department of Correction on January 24, 2020. *Id*.

**III. Discussion**

At the time of the incident, Ms. Capps was being held both on new charges and pending probation violations. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), the Supreme Court held that a pretrial detainee's excessive force claim against a jail officer under the Due Process Clause must be evaluated based on the objective reasonableness of the officer's conduct. This is a lower bar than an excessive force claim brought by a convicted prisoner under the Eighth Amendment in which the force must have been "maliciously and sadistically" inflicted. *Id*. at 2475 (citing *Ingraham v. Wright*, 430 U.S. 651, 671–72 (1977)).

Since *Kingsley*, neither the Seventh Circuit nor district courts have decided whether an individual held on new charges and on a probation violation petition is a pretrial detainee or a convicted prisoner. Previously, the Seventh Circuit described this inquiry as "academic" because the same standard applied in either circumstance. *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003). After *Kingsley*, the inquiry is no longer "academic" but remains unresolved, and, accordingly, in support of his motion for summary judgment, Officer Yeley analyzed Ms. Capps' claims under both the Fourteenth Amendment and Eighth Amendment standards.

**A. Fourteenth Amendment**

Ms. Capps can only succeed on a claim under the Fourteenth Amendment if she shows Officer Yeley's actions were objectively unreasonable. "[O]bjective reasonableness turns on the

facts and circumstances of each particular case," and the "court must make this determination from the perspective of a reasonable officer on the scene." *Kingsley*, 135 S. Ct. at 2473. "[D]eference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 2474. The following factors, although not an exclusive list, may assist the factfinder in determining reasonableness:

> the relationship between the need of the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Based on its review of the record, the Court concludes that the force used during the escort was reasonable. Although Ms. Capps did not resist during the escort, she was combative during the initial detention and handcuffing. She argued with officers for several minutes, and when they told her to place her hands behind her back to be handcuffed, she grabbed the handrailing and would not let go until one of the officers displayed pepper spray. Thus, it was reasonable for Officer Yeley to hold her arm during the escort to maintain control of her until she was secured in the holding cell. While Ms. Capps looked emotionally upset during the escort, she did not appear to express physical pain or discomfort. No reasonable juror who viewed this video would find that Officer Yeley's grip on Ms. Capps' arm was an unreasonable use of force. *Williams v. Brooks*, 809 F.3d 936, 942 ("When the evidence includes a videotape of the relevant events, the Court should not adopt the nonmoving party's version of the events when the version is blatantly contradicted by the videotape." (citing *Scott v. Harris*, 550 U.S. 372, 379–80 (2007))).

The Court disagrees with the assertion that the video incontrovertibly shows that Officer Yeley's grip did not cause Ms. Capps' bruising on her arm. See dkt. 18-1 and 18-2. The Court has reviewed the video several times and compared it to the pictures of Ms. Capps' bruises, and finds

it is possible that Officer Yeley's hand positioning corresponded to at least some of the bruises. But this does not change the outcome. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) (quoting *Graham v. O'Connor*, 490 U.S. 386, 396 (1989)). The same rationale applies to a claim of a pretrial detainee under the Fourteenth Amendment, as both Fourth and Fourteenth Amendment use-of-force claims use an objective reasonableness analysis. Ms. Capps did not need medical treatment for the bruises on her arm; they healed on their own. *See DeWalt v. Carter*, 224 F.3d 607, 610 (7th Cir. 2000) (minor bruising resulting from shove is "de minimus" injury and therefore does not rise to a constitutional violation), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020). Thus, even assuming Officer Yeley's grip caused some bruising, those injuries alone were not severe enough to render Officer Yeley's actions excessive. *Kingsley*, 135 S. Ct. at 2474. Ms. Capps does not allege that the March 20 incident with Officer Yeley caused post-traumatic stress disorder, but that it triggered her preexisting condition of post-traumatic stress disorder. She cites no authority, however, for the proposition that otherwise objectively reasonable force becomes unreasonable if it triggers or exacerbates a preexisting condition.

Officer Yeley is entitled to summary judgment because no reasonable juror could find that his actions during the escort were objectively unreasonable.

**B. Eighth Amendment**

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (citing *Whitley v. Albers*, 475 U.S. 312,

320-21 (1986)). Several factors are relevant to this determination, including the need for force, the amount applied, the threat a guard reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7.

Because the Court concludes that Officer Yeley's actions were not objectively unreasonable, Ms. Capps' claim fails under the more stringent Eighth Amendment analysis. There is no evidence that Officer Yeley acted out of a desire to "maliciously or sadistically" harm Ms. Capps. Officer Yeley is entitled to summary judgment on any claim under the Eighth Amendment.

**C. Qualified Immunity**

Officer Yeley argues that to the extent Ms. Capps' constitutional rights were violated, he is entitled to qualified immunity. Because there was no constitutional violation, the Court does not address this argument. *See Flournoy v. City of Chi.*, 829 F.3d 869, 877 n.10 (7th Cir. 2016) ("The defendants alternatively argue that we should affirm based on qualified immunity. Because we uphold the jury's verdict that no constitutional violation occurred, we do not reach this alternative argument.").

## IV. Conclusion

For the reasons explained above, the defendant's motion for summary judgment, dkt. [18], is **granted**. Ms. Capps' claims are **dismissed with prejudice**. Final judgment shall issue accordingly.

**SO ORDERED.**

Date: 11/23/2020

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

ABBRELLA F. CAPPS
168857
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 MOON ROAD
PLAINFIELD, IN 46168

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com